# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| DAVID SCHOLL and GORDON E. GOUVEIA, Trustee of the Bankruptcy Estate of PAULA MOREY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:10-CV-343-TLS |
| | ) | |
| EDUCATION MANAGEMENT CORPORATION, COMMONWEALTH BUSINESS COLLEGE EDUCATION CORPORATION, and BROWN MACKIE COLLEGE, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [ECF No. 29], filed by Defendants Education Management Corporation, Commonwealth Business College Education Corporation, and Brown Mackie College. The Defendants' Motion requests summary judgment on all of the claims asserted in the Amended Complaint. The Plaintiffs, David Scholl and Gordon E. Gouveia, the Trustee of Paula Morey's bankruptcy estate, respond that a jury should decide whether the Defendants retaliated against Scholl and Morey for engaging in statutorily protected activity. The Plaintiffs' response does not address Scholl's hostile work environment claim, Scholl's state law claim for intentional infliction of emotional distress, or Morey's constructive discharge claim. For the reasons set forth in this Opinion and Order, the Court will grant summary judgment in favor of the Defendants on all the claims asserted by the Plaintiffs.

# BACKGROUND

The Plaintiffs are former employees at Brown Mackie College's Merrillville, Indiana, campus. They initiated this litigation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Indiana law. In Count I of the Amended Complaint, Scholl alleges that he was subjected to discrimination on the basis of his sex when his mostly-female co-workers and colleagues subjected him to a hostile work environment. Scholl alleges in Count II of the Amended Complaint that, after complaining of the harassment, co-workers and managers retaliated against him. In Count III, Scholl alleges that it was unlawful retaliation for the Defendants to terminate his employment for refusing to disclose to them the details of an EEOC Complaint that he filed on August 25, 2009. He also claims, in Count IV, that this retaliatory termination violated Indiana state law, and alleges in Count V that the Defendants' actions constituted intentional infliction of emotional distress. Morey's only claims, set forth in Count VI of the Amended Complaint, are that the Defendants retaliated against her after she witnessed the acts of discrimination and retaliation alleged by Scholl, and after filing her own EEOC Complaint for retaliation, and that she was constructively discharged when the retaliation caused her to resign her employment with the Defendants.

The Defendants have addressed all of these claims in their Motion for Summary Judgment. For their part, the Plaintiffs oppose summary judgment on the retaliation claims, but make no mention of the other claims asserted in the Amended Complaint. The submissions this Court has considered include the Defendants' Motion for Summary Judgment [ECF No. 29], the Defendants' Brief in Support of Their Motion for Summary Judgment [ECF No. 30], the Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment [ECF No. 33],

the Defendants' Reply Brief in Support of Their Motion for Summary Judgment [Ecf No. 36], and all the attachments and exhibits thereto.

## STATEMENT OF FACTS

**A.    Background**

Brown Mackie College is owned and operated by Defendant Education Management Corporation (EDMC). In December 2008, the College hired Plaintiff Scholl as an adjunct instructor in the Allied Health Department at its Merrillville campus. Shortly thereafter, Sheryl Elston, the President of the College, and Linda Patefield, its Human Resources Manager, in consultation with EDMC's central services, decided to terminate the College's Allied Health Department Chair, Carol Jarrell. In April 2009, the Plaintiff was promoted to the Allied Health Department Chair position. He reported directly to the College's Dean of Admissions, Mark Palumbo, and had supervisory authority over the Allied Health Department faculty instructors, including Plaintiff Morey. Morey had been an adjunct faculty instructor since August 2007.

**B.    Scholl's Allegations of Gender-Based Harassment**

On April 21, 2009, the College held a new student orientation and open house. Sometime during the event, Tiffany Brack, who was also one the College's department chairs, interrupted a conversation Scholl was having with Morey near his cubicle. According to Scholl, Brack got three inches away from his face and yelled at him to ask whether he had answered her cell phone. Scholl asked her why he would answer her phone, and she responded he was the only man there. Scholl disputed the fact, as other men were around including another department

chair and male students. Scholl reported the incident to Dean Palumbo, who talked to Brack the next day. Brack left Palumbo's office tearful and told Scholl that the Dean was making her apologize to Scholl, so this was his apology. That same day, Brack sent Scholl an email apologizing for her behavior and explaining her actions:

> I am so sorry for last night. I was emotional because my husband was accusing me and asking why a man would answer my phone. I asked Marv and you hoping it was one of you because of the incidences we have been having here. I am completely sorry for interrupting you when you were talking to someone else. It will not happen again. Sorry. Please accept my apology. Thank you.

(Apr. 22, 2009, email, ECF No. 30-3 at 106.)

On the same evening that Brack confronted Scholl about her phone, Scholl overheard Brack's side of a phone conversation. According to Scholl, Brack said that she would be able to do her job "if he would get the hell out of my way." (Scholl Dep. 26–27.) Scholl believes that Brack was talking about him because she pointed at him when she said it. Scholl did not talk to Brack or anyone else about the comment, either to complain or to inquire what Brack meant.

On one occasion around this same time, Brack interrupted Scholl's class to provide information to his students regarding professional certificates. She stated, in front of the class, that she would not have to provide the information if Scholl had been doing his job properly. Another department chair, Jan Sebestyn, walked into Scholl's class in April or May and told the students that they didn't know how difficult it was working with Scholl every day.

## C.     The College's Electronic Gradebook

The College maintains its students' grades in an electronic database, called Gradebook, using an online software program referred to as eCollege. Scholl discovered that on several

4

occasions the grades he had entered in Gradebook were missing, and he had to manually re-enter them. Scholl printed documentation showing Brack as a user in his grade book, as well as in Morey's, for significant periods of time. Scholl shared this information with Morey. He believed that this activity proved that Brack altered his grades.[1]

During fall 2009, the College identified several operational and technical issues with its eCollege use. For example, many faculty members had been entering grades in the wrong screen, which resulted in unsaved data. In addition, most faculty members were not taking proper security precautions when using eCollege, particularly with respect to their usernames and passwords, which were formulaic and easily identifiable. When Scholl printed the user activity report showing Brack as a user, most of the faculty had not personalized their usernames and passwords and were still using the standard login information. In addition, faculty members would often forget to log out of their eCollege account on shared computers, which led to another faculty member logging into eCollege under the same username. To remedy these security deficiencies, the College implemented a system-generated password process that required all eCollege users to change their default passwords.

During the litigation of Scholl's lawsuit against the Defendants, Scholl produced the eCollege user activity reports that he had printed and relied upon to form his belief that Brack deleted his students' grades. The reports showed that a user had logged into eCollege using Brack's username or password to open a particular course page, but they did not demonstrate

---

[1]Scholl also documented that two other department chairs had been in his grade book. He does not appear to be alleging that they also deleted grades. Any staff that held the position of department chair had access to view the grades of all students in all courses in eCollege so as to be able to monitor their academic progress. Any faculty member given "faculty-level" access to Scholl's classes, including adjunct faculty instructors under his supervision, had the ability to change or delete Scholl's students' grades.

that Brack changed or deleted any grade entries. Scholl did not have the level of access to the database that would allow him to determine whether a specific user had deleted grades. In addition, after the College became aware of Scholl's allegation that Brack had deleted his grade entries, it asked Cynthia Govreau, the employee responsible for overseeing the College's use of eCollege and Gradebook, to investigate whether anyone using Brack's username changed any of Scholl's students' grades. Govreau conducted a forensic exam with the aid of eCollege's parent company. She determined that Brack did not change any of Scholl's students' grades.

**D.      EEOC Charges and Scholl's Termination From Employment**

On August 25, 2009, Scholl filed a Charge of Discrimination with the EEOC, alleging that he had been the recipient of continuing and ongoing harassment from Brack, specifically referencing the access to his grade book and missing grades. The following day, Scholl informed Morey and Elston of the Charge. On August 26, Morey filed her own Charge of Discrimination for retaliation. Citing the removal of her grades from the computer, she alleged that she was being retaliated against because she witnessed Brack's harassment of Scholl.

On September 11, Antonio Rios, EDMC's Regional Vice President, met with Scholl to discuss his EEOC Charges and issues that Scholl had raised in emails he sent to Rios and others in the corporate division. The Plaintiff told Rios that he already told him all the issues. When Rios pressed for the Plaintiff to tell him about his EEOC Complaint, the Plaintiff ended the conversation and left. On September 22, Rios, Elston, and Dondi Kuennen, EDMC's Vice President of Human Resources for Brown Mackie Colleges, met with Scholl in Elston's office as part of an internal investigation regarding Morey's EEOC Charges. Scholl was Morey's direct

report and Morey had indicated in her Charge that he was a person who might have information relevant to her claims. When the Plaintiff refused to answer questions, he was informed that EDMC's Code of Business Ethics and Conduct stated that employees were responsible to cooperate with EDMC representatives in any internal investigation, and that his refusal to cooperate with the internal investigation would be considered insubordination, the consequences of which could include termination of employment. The Plaintiff believed that the EEOC laws prohibited Rios, Elston, or Kuennen from asking Scholl about his Charge, and he refused to discuss Morey's Charge because it was intertwined with his own. When Scholl still refused to answer any questions, he was placed on administrative leave for failing to cooperate with the investigation and left the meeting. The next day, on September 23, Scholl filed a second Charge of Discrimination, charging that the Defendants placed him on administrative leave for refusing to participate in the investigation, which he believed was retaliation. On September 28, Kuennen, along with Rios and Robert Troike, the Senior Vice President of Human Resources, decided to terminate Scholl's employment for his refusal to cooperate with an internal investigation pertaining to an EEOC Charge filed by one of his direct reports in violation of EDMC's Code of Business Ethics. Kuennen sent Scholl a letter advising him of their decision. The letter explained that as Morey's first line supervisor, his unwillingness to cooperate hampered EDMC's ability to conduct a thorough investigation of Morey's EEOC Charge.

**E.      Additional Allegations of Retaliatory Acts–Scholl**

Scholl's brief in response to the Defendants' Motion for Summary Judgment sets out several incidents that occurred after he filed the August 25 Charge of Discrimination. These

include a comment by Sebastyn that all her headaches and trouble began as soon as Scholl filed the EEOC Charge, and a similar comment by Patefield. Scholl also complains that Patefield called him a "horrible father" when he declined to take cake home to his children, which Patefield had offered him after a party held at work, because he did not want them to have all that sugar. (Scholl Dep. 79–80.) Responding to an inquiry why he believed this had anything to do with his EEOC Complaint, Scholl stated: "Because I think it's in direct retaliation for my E.E.O.C. Complaint and she was very good friends with Carol Jarrel." (Scholl Dep. 80.) Saundra Howard, the Dean of the College, sent Scholl emails that contained many exclamation points, which Scholl interpreted as shouting, demeaning, and unprofessional.

On one occasion, Scholl attempted to help a student who was having a problem with a financial issue related to the College by bringing the problem to management at the campus level. When the issue was not resolved, he advised the student to go outside the campus level. Elston told Scholl that he would be terminated if he did that again. In response to a deposition inquiry why he believed that was discriminatory or harassing, Scholl responded:

> Because she had the opportunity, as well as everyone else in the management team of that campus to resolve that issue, and they did nothing to resolve that issue for that student. And by my telling the student take it outside of the campus, gave her an opportunity to threaten me with termination for insubordination, and that is directly harassing me.

(Scholl Dep. 85.)

According to Scholl, Elston moved his desk and workspace from the cubicle area where the other department chairs were located to a store room inside a classroom. This room, which had been used at times for storage and other times as an office, was located adjacent to the medical lab where Scholl taught some of his classes. In addition, the space was fully equipped to

serve as a functioning private office with phone, fax, and internet capabilities. Scholl complains that the move hindered his students' access to him because "no one knew where to find me even though I told them." (Pl.'s Dep. 90, ECF No. 33-1.) To accommodate his students, Scholl asked them to call his cell phone and then arranged to meet them at another location. Scholl did not make any complaints about the room or ask to be moved back to the cubicle.

According to Scholl, Elston walked by his desk and gave him dirty looks and spoke to him in an unprofessional and hostile tone. He believes this was in response to filing an EEOC Charge.

As another incident of retaliation, he testified that he told Elston's new assistant where he would be so she could relay the information to any students who were looking for him, but that she instead told a student that she did not know where Scholl was or if he was even on campus that day. He believes her conduct was retaliatory because he "specifically told her before I started that exam where I was at if students needed me, and she told that student that she had no idea where I was." (Pl.'s Dep. 98.) After the assistant gave the student inaccurate information, Scholl reminded the assistant where he would be if any other students came looking for him and to have the student come see him, and she said okay.

Scholl believes that he was excluded from two meetings that other department chairs attended. He does not know the topic of the meetings. He also believes that his request for medical supplies necessary to teach his medical classes was delayed in retaliation for filing the EEOC Charge. He ultimately received a small supply, along with instructions to use enough to get through class and nothing more. Scholl does not know whether other departments requested supplies or were denied requests for supplies. Elston states that her review of all the requests that

Scholl made for supplies for classes in the Allied Health Department shows that he was never denied a request for supplies. She contends that there are no records that the department had an insufficient inventory of supplies during Scholl's tenure as the department chair.

Scholl also stated in his deposition that he would come to his office in the morning and find it open, his locked file cabinets open, files and documents removed, and his computer on as if somebody had been using it.

When Govreau conducted an in-service program at the College, she used a hypothetical EEOC harassment complaint on the board as an example. She specifically asked Scholl and Morey if they had any questions and did not ask any of the other thirty or more attendees if they had questions. Also, during that meeting, Govreau asked Scholl to move to the front of the room from his location in the back of the room next to Morey.

After he filed his EEOC Charge, a campus security officer named Mitch began following him around the College.

## F.      Additional Allegations of Retaliatory Acts–Morey

Morey points to several events that occurred after she filed her EEOC Charge that she believes were in retaliation for filing the Charge. Like Scholl, Morey points to missing grades that she had already entered. Also like Scholl, Morey believed that campus security was following her around the College excessively. She also complains that Patefiled and Sebestyn would interrupt her classes to make announcements about bake sales, graduation gowns, or financial issues.

One matter that Morey objects to is the College's handling of her evaluation. Scholl was

required to evaluate Morey as an instructor in his department. The College's performance evaluation system provides rating for several categories on a scale from 1 to 5. The College's customary practice is to give instructors who consistently perform to expectations scores of 3. Performance evaluations that primarily have ratings of 4 and 5 are a rare exception. If consistently high scores of 4 or 5 are awarded, the College requires the evaluator to provide additional supporting documentation, such as in-class observations. Patefield provided training to the department heads, including Scholl, that communicated these standards. On August 31, 2009, Scholl prepared an evaluation of Morey in which he gave her scores of 4 or 5 for every category. When Patefield saw the evaluation, she reiterated to Scholl in an email that the College considered 4's and 5's to be exceptional scores that were above the norm, and that 3's were typical. When Scholl presented the evaluation to Howard (then Assistant Dean) for her approval, Howard asked Scholl to provide detailed information to explain his rationale for the high marks because 3's were intended to be used for employees who consistently performed to expectation. Scholl prepared a revised evaluation and Morey received a merit increase in her pay in her next contract.

Morey complained by email to Rios that Patefield's communication advising Scholl to reconsider the marks he gave to Morey on her evaluation violated the Defendants' policies with respect to "ethical and legal treatment of faculty." (Sep. 2, 2009, email, ECF No. 30-4 at 51.) Rios thanked Morey for her email and informed her that he asked the Regional Vice President for Human Resources, Cheryl Farnsley, to reach out to Morey on the matter. After Farnsley attempted to contact Morey, she again wrote Rios to state that she would not discuss the issue with Farnsley or anyone else from the College, and that all further questions should be referred

11

to the EEOC. A few days later, on September 11, when Rios and Kuennen attempted to speak with Morey to discuss her EEOC complaint, she refused to speak to them.

After Scholl's employment was terminated, Sebestyn replaced him as the Allied Health Department Chair on an interim basis. Sebestyn asked Morey and others who lived near her to give her rides home at the end of the work day. When Morey refused because she was going to be leaving early, Sebestyn told Morey that she would issue her a written discipline if she left early. Morey said she would not leave early, and Sebestyn told Morey that she guessed Morey was giving her a ride home then. Sebestyn also had Morey get her food and supplies and do other menial tasks that Morey believed Sebestyn could have done herself. On one occasion when Morey told Sebestyn that she did not have time to get her food, Sebestyn reminded Morey that Sebestyn was her boss and could get her fired if she tried hard enough and Morey better just get her food and not question her.

On September 30, Morey sent Elston an email stating that she would not be signing a new contract. The next day, she stated that, after much deliberation, she would sign a new contract. On October 28, 2009, Morey submitted a letter of resignation, which cited Sebestyen's "series of retaliation events against me concerning her transportation issues and her attempts to coerce me into proving her transportation on a daily basis" as creating a "hostile work environment." (Oct. 28, 2009, Letter, ECF No. 30-4 at 56.) She requested that she not be contacted "for any reason whatsoever because this will be considered harassment." (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the facts supported by materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56-1(a) (stating that the movant must provide a "Statement of Material Facts" that identifies the facts that the moving party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed in Rule 56 to designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56-1(b) (directing that a response in opposition to a motion for summary judgment must include "a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary"). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp*., 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to

decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

## ANALYSIS

**A.      Scholl's Claim of a Hostile Work Environment Based on Gender**

Scholl offers no analysis or argument in support of his hostile work environment claim. The only facts in the record that could plausibly go to such a claim are his interactions with Brack and the one-time comment by Sebestyn to the students in his class. The designated evidence, however, is insufficient to establish that Scholl was subject to an environment that was so severe or pervasive that it altered the conditions of his employment and created an abusive working environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). The complained of conduct was not frequent, severe, physically threatening or humiliating, nor did it unreasonably interfere with his work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). In other words, Scholl's colleagues did not, by their offhand comments and isolated confrontations, subject him to "an abusive working environment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).

Neither does any of the alleged harassment appear to have been based on anti-male

animus. Brack's reason for confronting Scholl about answering her phone was directly related to the fact that her husband told her that a man had answered her phone, and Brack communicated this reason to Scholl the next day. This was not an act of gender bias, but was a reasonable response to a specific situation in which all of the available information indicated that a man had answered Brack's phone. Scholl points to no other occasion where Brack accused him of something simply because he was a man. With regard to Brack's phone conversation that Scholl overheard, even if Brack was talking about Scholl when she indicated she could do her job if he would get out of her way, such a comment does suggest that it was motivated by gender animus, but instead out of a dislike for the perceived obstacle to her job performance. Likewise, even if Sebestyn's and Brack's comments to Scholl's students were intended to be insulting or embarrassing, there is nothing about them that suggests they were motivated by the fact that he is a man. *See e.g., Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (stating that the unkind or aggressive conduct of a supervisor was not motivated by race because it had no racial character or purpose to it). Scholl himself believed that the main reason for Brack's dislike of him was that he replaced her friend as the department chair. He testified that he believed Brack was attempting to sabotage his employment as the College because he "replaced her very dear friend, Carol Jarrel as the department chair, and she made no bones about telling me that on an almost daily basis when I first took that position." (Scholl Dep. 64–65.) Likewise, Scholl believes that Sebestyn's comment was based on his gender "[s]imply because [he] replaced her dear friend, Carol Jarrel, as the department chair." (Scholl Dep. 77.) His belief that the harassment would still have happened if he had been female, but not to the same degree, (Scholl Dep. 77–78) is no more than speculation.

No reasonable jury could conclude that the incidents about which the Plaintiff complains amounted to a hostile work environment, or that they were the result of anti-male animus. Accordingly, the Defendant is entitled to summary judgment on Count I of the Amended Complaint.

**B.      Retaliation**

A plaintiff may establish unlawful retaliation using either the direct or indirect method of proof. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Here, the Plaintiffs rely on the direct method of proof and must present either direct or circumstantial evidence of: (1) engagement in a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the protected activity and the adverse action. *Barton v. Zimmer*, 662 F.3d 448, 455 (7th Cir. 2011); *Humphries v. CBOCS, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).

1.      Morey's Retaliation Claim and Constructive Discharge Claim (Count VI)

In Count VI of the Plaintiffs' Amended Complaint, Morey alleges that she was retaliated against in violation of Title VII after she became a witness to acts of discrimination, specifically Brack's treatment of Scholl during the phone incident, and retaliation directed at Scholl and after she filed her own EEOC Charge for retaliation. Title VII protects employees who "oppose an unlawful employment practice under Title VII" or "participate in an official EEOC proceeding, investigation or hearing." 42 U.S.C. § 2000e-3(a). Before she filed the charge of discrimination, Morey did neither and thus fails to establish the first prong of a prima facie case. There is no

evidence that she reported the interaction between Scholl and Brack or otherwise opposed it. Thus, any incidents involving missing grades from her computer grade book that occurred before she filed the Charge of Discrimination could not be connected to activity protected by Title VII. In addition, it is undisputed that the missing grades were not even the result of employee tampering, but technical problems with the software.

On August 26, 2009, Morey filed an EEOC Charge complaining that her grades were removed from the computer in retaliation for witnessing her male boss (Scholl) being harassed by the female Department Chair (Brack). Morey's Charge of retaliation entitles her to protection from further retaliation, but only if she reasonably believed in good faith that she was being retaliated against for opposing unlawful conduct. *See Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890 (7th Cir. 2004); *see also Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532–33 (7th Cir. 2008). If an employee "does not honestly believe he is opposing a practice prohibited by the statute, *or* if his belief is objectively unreasonable, then his opposition is not protected by statute." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (citations omitted) (emphasis added). "Title VII was designed to protect the rights of employees who in good faith protest the discrimination they believe they have suffered and to ensure that such employees remain free from reprisals or retaliatory conduct." *Mattson*, 359 F.3d at 891. "Utterly baseless" claims do not receive protection under Title VII's opposition or participation retaliation clauses. *Id.*

Morey had no knowledge that operational and technical problems existed with the eCollege system, and the Court assumes, for purposes of summary judgment, that Morey was reasonable in her (mistaken and unsubstantiated) belief that another employee deleted grades that

she had entered. Even so, the allegations in her Charge do not provide an objective basis for a charge of retaliation. The undisputed evidence is that Morey witnessed Brack confront Scholl about whether he had answered her telephone. Morey stated in her deposition that Scholl told Brack that he did not answer her phone and asked why he would have. According to Morey, Brack responded "because you're the only man here, and you're the only one who would do such a thing." (Morey Dep. 38, ECF No. 33-2.) Brack kept pressing it, explaining that her husband said a man answered the phone and it could be Scholl. It is not reasonable, in this context and based on this single incident, to believe that Brack was subjecting Scholl to severe and pervasive hostile conditions of employment, and was doing so because he was a man. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (holding that the plaintiff did not engage in protected activity when she complained to her supervisor about an incident because no reasonable person could have believed that a single incident violated Title VII's standard for a hostile work environment); *O'Leary*, 657 F.3d at 631–32 (stating that an employee's complaint about a single instance of a sexually-charged remark was not protected opposition to discrimination because the conduct complained of could not objectively be thought of as sufficiently severe or pervasive to constitute sexual harassment proscribed by Title VII). Not only was it unreasonable to believe that Scholl was being subjected to gender discrimination based on Brack's conduct, it was also unreasonable for Morey to believe that being a witness to this single event entitled her to protection from retaliation—which was the sole basis for her EEOC Charge.

Without a reasonable belief that she was being targeted because she opposed a practice prohibited by statute, her EEOC Charge did not trigger Title VII's anti-retaliation provisions.

Curiously, Morey claims that she is entitled to protection under the participation clause, which refers to participation "in an investigation, proceedings, or hearing," in a Title VII action, 42 U.S.C. § 2000e-3(a), for her *refusal* to discuss her EEOC Charge with the Defendants during the course of their investigation. The Court does not agree with Morey's reasoning because refusal to answer any questions or provide any statements is the opposite of participation.

Even if the Court assumes that the Charge constituted statutorily protected activity, there is insufficient evidence from which a jury could conclude that Morey's Complaint prompted anyone to take adverse action against her. The Supreme Court has held that the anti-retaliation provision of Title VII "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee." *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006). The Court further explained that "the employer's actions must be harmful to the point that this could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* However, the Court did not retreat from the long established view that "personality conflicts at work that generate antipathy and snubbing by supervisors and coworkers are not actionable," emphasizing that it remained "important to separate significant from trivial harms." *Id.* at 68 (internal quotations omitted).

In response to the Defendants' Motion for Summary Judgment, Morey altogether ignores the materially adverse requirement. The only attempt she makes to show that any of the actions she complains about were causally connected to filing a Charge of Discrimination is that the "bulk of the events at issue" occurred after she filed the Charge. (Pls.' Resp. 15, ECF No. 33.) The Court does not consider the adverse impact of missing grades from the eCollege grading system, as the undisputed evidence does not support an inference that anything other than

operational and technical aspects of the program caused the deletion of grades. Morey complains that after she filed the Charge of Discrimination, Brack, Patefield, and Sebestyn would interrupt her classes to make announcements about bake sales, graduation gowns, or financial issues; one campus security officer followed her around the campus and in the parking lot; Brack followed her to the copy machine, the pop machine, and the bathroom; Patefield told Scholl to reconsider his scores for her evaluation; and Sebestyn required Morey to give her a ride home, to complete menial tasks such as getting her soda or a pencil, and told Morey she would terminate her employment if Morey did not do what Sebestyn asked. Morey presents this litany of complaints without any attempt to separate significant from trivial harms. Although Morey was bothered by these actions, she does not describe anything threatening or intimidating, or suggest that it created a significant alternation in her duties, such that it would dissuade a reasonable employee from filing a charge. With respect to her evaluation, she ignores the context of Patefield's communication with Scholl and the fact that she received a merit pay increase.

Moreover, Morey's belief that campus security was following her is speculative and cannot create a genuine issue of material fact. Morey presents no evidence tending to suggest that any of her supervisors or coworkers instructed security to follow her, and Elston definitively states that she did not direct the security guard, who reported directly to her, to follow Morey (or Scholl) or conduct surveillance on her. Nothing in the record creates an inference that Sebestyn's treatment of Morey was influenced or motivated by Morey's claim that Brack or others deleted her grades in retaliation for witnessing Brack's treatment of Scholl. Sebestyn temporarily replaced Scholl after the Defendants terminated his employment, putting her in a position of authority over Morey that coincided with a time period after she filed her Charge of

Discrimination. "The mere fact that one event preceded another does nothing to prove that the first event caused the second. . . . [O]ther circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)). Morey herself testified that Sebestyn asked everyone who lived in or near Portage, where Sebestyn's home was located, to give her a ride, including two other instructors. (Morey Dep. 120, ECF No. 30-4 at 46 ("She asked anybody who lived in or around Portage for a ride, or anybody going—she did not care who, and she expected a ride for free and not offering any gas money. And she didn't care, she just wanted a free ride. And sometimes she would stay there until 11:00, 11:30, 12:00 o'clock at night and expected the person who was giving her a ride to wait.").) Morey testified that Sebestyn's threat of termination came after she refused to perform a menial task for Sebestyn.

Indeed, for each of the incidents that Morey claims was retaliation, she offers nothing more than her speculation based on their occurring after August 26, 2009, to show that they were acts of retaliation related to her EEOC activity. Under ordinary circumstances, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is *other* evidence that supports the inference of a causal link." *Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (internal quotation marks omitted, emphasis added); *see also Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[W]e remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."). This case does not involve the kind of

circumstantial facts from which a jury could infer a causal link between Morey's EEOC Charge and retaliatory acts.

In addition to retaliation, Morey claims that her resignation on October 28, 2009, was a "constructive discharge occasioned by the severe hostile work environment created by the Defendants." (Am. Compl. ¶ 47, ECF No. 4.) To establish a claim for constructive discharge, a plaintiff must prove that unlawful discrimination made her working conditions so intolerable that a reasonable person would be forced to resign. *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). Generally, to support such a claim, a plaintiff's working conditions must be even more egregious than the high standard for hostile work environment claims, because, in the ordinary case, an employee is expected to remain employed while seeking redress. *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (quotation and citation omitted). Morey has made no attempt, in response to the Defendants' Motion for Summary Judgment, to meet this high standard, and the Court finds that she could not.

The Defendants are entitled to summary judgment on Count VI of the Amended Complaint.

2.      Scholl's Title VII Retaliation Claims (Counts II and III)

The Defendants argue that summary judgment should be granted in their favor because Scholl did not engage in protected activity when he filed utterly baseless charges of gender discrimination and retaliation. They assert that even assuming his charges of discrimination and retaliation constitute statutorily protected activity, he does not present evidence of a causal connection, and he was terminated for legitimate reasons.

As with Morey, Scholl's EEOC Charges entitle him to protection if he reasonably believed in good faith that he suffered gender discrimination and retaliation. *See Mattson*, 359 F.3d at 890; *see also Tate*, 546 F.3d at 532–33. The Defendants argue that Scholl's initial EEOC Charge is so utterly baseless that no reasonable person could believe that the underlying allegations constitute Title VII violations. In this Charge, Scholl alleged that Brack was attempting to sabotage his work by deleting grades because he reported her acts of harassment to the College's dean and because he replaced her former female co-worker. Although the allegations regarding grade tampering proved to have no merit, the Court does not find Scholl's allegations to be objectively unreasonable. With respect to the second EEOC Charge alleging retaliation, the Defendants argue that it frivolously asserts that he was being retaliated against when his employer required, in accordance with the College's ethics policy, that he participate in an investigation of the previous charges that he and Morey had filed. The Defendants argue that Scholl's belief that Title VII prohibits employers from asking employees about EEOC charges strains credulity because Title VII was enacted to prevent discrimination in the workplace, which necessarily requires investigating allegations of discrimination. The Defendants argue that Scholl's good faith intent is highly doubtful, particularly in light of his deposition admission that it is reasonable for an employer to conduct an investigation of a discrimination complaint to find out what happened and to take corrective action.

The Court finds that Scholl's belief that his employer could not obtain his witness statement in relation to an investigate of an EEOC Charge filed by his direct report, Morey, to have been unreasonable. Scholl cites no objective basis for such a belief, and his September 23 EEOC Charge based on being placed on administrative leave for refusing to cooperate in the

investigation did not trigger Title VII protection. Thus, his termination five days later cannot be considered an unlawful response to protected activity. In any event, the termination was the continuation of events put in place *before* Scholl filed his second EEOC Charge. The context of an employer's action is critical to whether an inference of causality is warranted. *Davis v. Time Warner Cable of Se Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011). Engaging in protected activity does not immunize an employee from being disciplined or terminated for workplace behavior, *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 376 (7th Cir. 2007); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002), and "where a significant intervening event separates an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail, *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (internal quotation marks and brackets omitted). Administrative leave was the result of a significant intervening event—Scholl's refusal to cooperate with an internal investigation—that separated his first Charge of discrimination from the adverse employment action. Although his employment was terminated shortly after his second Charge, the decision was the culmination of the consequences of that intervening event. The Defendants were under no obligation to forego action that was adverse to Scholl simply because he complained of their actions. *See, e.g., Love v. City of Chi. Bd. of Educ.*, 241 F.3d 564, 570 (7th Cir. 2001) ("We have consistently held that an employee's insubordination toward supervisors and coworkers, even when engaged in protected activity, is justification for adverse employment action.") (quoting *Kahn v. United States Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) (brackets and alteration omitted)). Moreover, the Plaintiff does not present evidence from which a jury could reasonably conclude that the Defendants had the Charge in mind when terminating his employment. He does not even

attempt to establish that the decision makers were aware that he filed a second Charge after they placed him on administrative leave.

Scholl argues that his failure to talk about Morey's EEOC Charge was reasonable, and that it is the Defendants' burden to show otherwise. The Court disagrees, insofar as it is the Plaintiff's burden to show that the Defendants' decision to terminate his employment was motivated by activity that was protected by Title VII, not just by activity that he considered reasonable. By citing to *Smith v. Columbus Metropolitan Housing Authority*, 443 F. Supp. 61 (S.D. Ohio 1977), the Plaintiff appears to be asserting that his failure to participate in his employer's investigation was statutorily protected activity. The plaintiff in *Smith* was a coworker of an employee who had filed a EEO complaint against their employer, prompting an investigation by the EEOC. The plaintiff was asked to sign an arguably false affidavit tending to exculpate her company. She refused and was demoted as a result. She later sued under the "participation provision" of Title VII and won. The district court found that, "[b]ecause anything the employee relates is potentially impeachment material should he later change his version of the events, the employee's decision whether to cooperate is one which affects his participation in a pending proceeding." *Id.* at 64. Therefore, "whether an employee decides to assist the charging party, or refuses to assist the respondent employer, the employer may not retaliate against the employee, because this decision of the employee constitutes participation in an investigation or proceeding under Title VII." *Id.*

Scholl has not pointed to any precedent in this Circuit that would support a finding that refusal to participate is protected activity under Title VII's participation clause. Even in the Sixth Circuit, where the issue has been addressed since the district court's decision in *Smith*, *see*

*Merkel v. Scovill Inc.*, 787 F.2d 174 (6th Cir. 1986), refusal to participate is only protected activity under two exceptions: when an employer pressures an employee to give a statement it knows or should know to be false; or when an employer pressures an employee to give statements or evidence the employer does not reasonably believe the employee possesses, *id.* at 180. The context of Scholl's refusal does not fall within either of these exceptions. To the contrary, the Defendants were not attempting to pressure Scholl into making statements that it knew or should have known were false, and the Defendants had reason to belief, based on Morey's Charge, that Scholl had information about the events in question. The purpose of the anti-retaliation provision is to advance Title VII's objective to create workplaces free of discrimination by preventing employers from interfering with an employee's attempts to enforce or advance the act's specific guarantees. *White*, 548 U.S. at 63. Here, the designated evidence does not suggest that the Defendant were attempting to frustrate the purposes of Title VII or interfere with Scholl's attempts to enforce Title VII's guarantees. Accordingly, Scholl's refusal to answer questions did not constitute protected activity under Title VII's participation clause, and his placement on administrative leave and ultimate termination from employment is not actionable.

With regard to Scholl's other complaints of retaliation, they do not give rise to Title VII protection because they are not materially adverse and, in most instances, bear no connection to his protected activity—with the exception of Patefield's and Sebastyn's comments about Scholl's EEOC Charge being the cause of their headaches, which was in direct response to his protected activity. However, it is not the kind of behavior that would dissuade a reasonable employee from filing a charge. Being told he was a terrible father because he would not give

sugar to his children is not only a petty slight, from which Scholl was not immunized based on his decision to report Brack's conduct, but it has no connection to his protected activity. Scholl's own testimony shows this; when asked why he believed it had anything to do with his EEOC Complaint, Scholl responded with circular speculation. (Scholl's Dep. 80 ("Because I think it's in direct retaliation for my E.E.O.C. Complaint.").) Speculation and conjecture are beyond the scope of the Court's obligation to the Plaintiff. *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008). So too, emails that use exclamation points for punctuation, dirty looks, and exclusion from two meetings of an unknown subject would not dissuade a reasonable employee from filing a charge. *See, e.g., Henry v. Milwaukee Cnty.*, 539 F.3d 573, 586 (7th Cir. 2008) (finding that unspecified intimidation, door slamming by superiors, missing or marked up time cards, and other incidents were petty slights and mere annoyances rather than materially adverse actions capable of sustaining a retaliation claim).

The Court finds that the disruption of a work space that is intended to be personal and secure, and removal of documents could arise to the level of a materially adverse action. However, there is no evidence hinting at who may have been responsible, much less any indication that timing alone could support an inference that is was related to his protected activity. With respect to the intrusion in his office space, Scholl designates pages 92 and 93 of his own Deposition, during which the following exchange took place:

> Q. Were there any other acts that you believe were discriminatory and harassing, other than those that we've talked about?
>
> A. Other than coming into my office on a daily basis, at one point every day I would come in, my office would be open, my locked file cabinets would be open, files removed, student files, instructor files. My computer was on all the time. My computer would be on when I came in in the morning, as if somebody had been using it. My file cabinets were open, books were missing, documents were missing.

Other than that, no.

(Scholl Dep. 92–93.) Later during the deposition, when Scholl was asked if he had any knowledge of the individuals doing that to his office, he responded, "The only people who would have access to my office are people that have access to open my file cabinet, and I have no idea who they are." (*Id.* at 129.) Although Scholl, presumably, would like the Court to conclude that persons desiring to retaliate against him for complaining of discrimination were the perpetrators of this activity, such an inference is not reasonably supported by the designated evidence. *See Parker v. Fed. Nat'l Mortg. Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984) ("The district court is not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable ones.").

Likewise, Scholl has not proffered any evidence to support an inference that a campus security guard monitored him at the bequest of the Defendant or out of any retaliatory intent, or that the guard's actions interfered with the performance of his job in any way. Although Scholl cries foul because Elston's assistant gave a student erroneous information concerning his whereabouts, none of the evidence suggests that her actions were related to his protected activity, much less intentional acts intended to harm him. So too, Elston's directive that Scholl not advise students to take complaints outside the campus level was in direct response to Scholl's interactions with a student, which, according to Scholl's own testimony is what gave Elston "an opportunity to threaten me with termination for insubordination." (Scholl Dep. 85.) Scholl makes no attempt to show that Elston responded to him differently than she would have to another employee in the same situation, or that she responded to him differently than she would have if the events had occurred before he engaged in protected activity.

Although moving an employee's desk into a closet could be materially adverse, the circumstances of this case do not support an inference that the change in conditions was materially adverse or retaliatory. Scholl was moved from a cubicle area to a private space adjacent to a classroom. Although these spaces had difference characteristics, there is no evidence to suggest that the new space was objectively inferior, Scholl's characterization of the office as a storage room notwithstanding. *Cf. Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996) (stating that the scope of "adverse employment action" includes moving an employee "from a spacious, brightly lit office to a dingy closet"). He makes no argument that his presence in the cubicle area was necessary to perform his duties or that the office space was inadequate. His only complaint is that students could not easily locate him, and that he would have to arrange to meet them in another area of the campus. Scholl does not suggest that this was an unworkable solution, or that they could not then walk to his office for future reference. At most, this was a minor inconvenience. Moreover, none of the evidence presented by Scholl would allow a reasonable jury to infer that the move was a response to his complaint of gender harassment simply because it was executed some unidentified time after he filed the EEOC Charge. The same is true of his complaint about supplies; it is vague, unsubstantiated by the record, caused no materially adverse changes or consequences, and bears no connection to his EEOC Charge. Finally, Scholl fails to explain how he was negatively impacted by the topic of Govreau's in-service program or her request that he move to the front of the room during the program.

C.      **Scholl's Common Law Retaliatory Discharge Claim (Count IV)**

In the Amended Complaint, Scholl alleges that his termination from employment was in

violation of the public policy of the State of Indiana. In response to the Defendants' request for summary judgment, Scholl provides no analysis of his state law claim for retaliatory discharge. By ignoring this claim, Scholl also ignores any application of Indiana's employment-at-will doctrine or any exception to the doctrine. To assert a claim for discharge that is contrary to Indiana public policy, there must be no other remedy adequate to deter the employer's conduct. *Clardy v. MPW Indus. Servs., Inc.*, 3:11-CV-00035-RLY, 2011 WL 4036536 (S.D. Ind. Sept. 12, 2011); *Chambers v. Walgreen Co.*, 2:09-CV-193-TS, 2009 WL 3568659, at *2 (N.D. Ind. Oct. 26, 2009); *Boyer v. Canterbury Sch., Inc.*, 1:04-CV-367-TS, 2005 WL 2370232, at *5 (N.D. Ind. Sept. 27, 2005)); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 503–04 (7th Cir. 1999) (rejecting the plaintiff's claim for an exception to Indiana's employment at will doctrine because the Indiana legislature had created a specific statutory remedy for discharge of an employee who complained about health or safety issues in the workplace). Here, Scholl had other statutory remedies available to him, specifically under Title VII. Accordingly, the Defendants are entitled to summary judgment on Count IV of the Amended Complaint.


**D.**     **Scholl's Claim of Intentional Infliction of Emotional Distress (Count V)**

Although Scholl includes a state law claim for intentional infliction of emotional distress in the Amended Complaint, and the Defendants request summary judgment on the claim, Scholl does not acknowledge it in his Response in Opposition to Defendants' Motion for Summary Judgment. The Court will not speculate as to the facts that Scholl believes would support this claim, and accepts the Defendants' argument that he cannot provide facts in the record that would plausibly satisfy the elements of this tort: 1) extreme or outrageous conduct by the

defendant; 2) which intentionally or recklessly; 3) causes; 4) severe emotional distress to another. *See Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991). "When a plaintiff fails to produce evidence, the defendant is entitled to judgment; a defendant moving for summary judgment need not produce evidence of its own." *Marion v. Radtke*, 641 F.3d 874, 876–77 (7th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The Defendants are entitled to summary judgment on Count V of the Amended Complaint.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendants' Motion for Summary Judgment [ECF No. 29]. The Clerk will enter judgment in favor of the Defendants and against the Plaintiffs.

SO ORDERED on September 7, 2012.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION